UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| HEATHER GAKER,<br><br>        Plaintiff,<br><br>        v.<br><br>CITIZENS DISABILITY, LLC,<br><br>        Defendant. | Case No. 20-CV-11031-AK |

**MEMORANDUM AND ORDER ON
CROSS MOTIONS FOR SUMMARY JUDGMENT**

**A. KELLEY, D.J.**

This is a consumer protection action brought pursuant to the Telephone Consumer Protection Act ("TCPA"). The plaintiff, Heather Gaker ("Ms. Gaker") alleges that defendant Citizens Disability, LLC ("Citizens") violated the TCPA by placing telemarking calls to her cell phone without her prior consent despite her being on the Do Not Call Registry. Citizens argues that Ms. Gaker consented to receive such calls. The parties have cross-moved for summary judgment.

**I.    BACKGROUND**

In evaluating the cross motions for summary judgment, the Court relies upon Ms. Gaker's response [Dkt. 77] to Citizens' statement of undisputed material facts [Dkt. 66, "Def. SMF"], and Citizens' response [Dkt. 74] to Ms. Gaker's statement of undisputed material facts [Dkt. 70, "Pl. SMF"]. All facts admitted by both parties are deemed true, and all facts contested by one party are deemed to be in dispute pending trial.

1

### a. Uncontested Facts

Ms. Gaker is a Boynton Beach, Florida resident with a recognized disability who has received Supplemental Security Income benefits since 2015. [Pl. SMF ¶¶ 1–2]. On or around November 15, 2019, Ms. Gaker registered her cell phone number on the Do Not Call Registry. [Id. ¶ 4].

Citizens is a Massachusetts for-profit corporation which assists persons with disabilities in claiming benefits from the Social Security Administration, deriving its revenue from contingency fees from awarded benefits. [Id. ¶ 6; Def. SMF ¶ 1]. Citizens relies on telemarketing to reach potential clients. [Pl. SMF ¶ 7]. Approximately 40 to 50 percent of Citizens' "leads" are generated through Digital Media Solutions, a marketing vendor. [Id. ¶ 7; Def. SMF ¶ 3]. A "lead" typically includes an individual's name, telephone number, mailing address, and email address. [Def. SMF ¶ 4]. After receiving a "lead," Citizens confirms that the individual's IP address is within the United States before placing a telemarketing call, but does not use two-factor authentication to confirm the lead. [Pl. SMF ¶¶ 25–27]. The corporate designee of Citizens gave deposition testimony that people "looking for free money online" are people Citizens wants to "talk with," as there is a chance these people have a disability. [Pl. SMF ¶ 24]. Citizens does not subscribe to the Do Not Call Registry, [Def. SMF ¶ 6], and does not check the Do Not Call Registry before calling a "lead" if it has what it considers to be express written consent from that "lead," [Pl. SMF ¶ 29].

On January 3, 2020, Citizens received Ms. Gaker's personal information through a website operated by Digital Media Solutions. [Pl. SMF ¶ 7; Def. SMF ¶ 10]. A "Trusted Form" report documented the entry of Ms. Gaker's personal information from an IP address located in Hollywood, Florida. [Pl. SMF ¶¶ 11–12]. This report, which contains a visual playback link

recreating the entry of Ms. Gaker's information, shows that the information was entered on the Super-Sweepstakes.com website that was in effect as of January 2020. [Pl. SMF ¶¶ 12–14]. Ms. Gaker does not have a specific recollection of visiting this website or entering her personal information on it.[1] [Pl. SMF ¶ 15; Def. SMF ¶¶ 17–18].

A reproduction of the Super-Sweepstakes.com website contains images of gold coins, dollar signs, and text reading "Where should we send YOUR $50,000 if you win?" [Pl. SMF ¶¶ 16–17]. Beneath this question, there are fields in which an individual can enter personal data. [Pl. SMF ¶ 18]. Beneath these fields, there are additional promotional offers, a box reading "CONFIRM YOUR ENTRY," and at the bottom of the website, a royal blue box containing a disclaimer written in small navy blue font. [Pl. SMF ¶¶ 19–21]. This disclaimer reads:

> By clicking confirm your entry I consent to be contacted by any of our *Marketing Partners*, which may include artificial or pre-recorded calls and or text messages, delivered via automated technology to the phone number(s) that I have provided above including wireless number(s) that I have provided including wireless number(s) if applicable regarding financial, home, travel, health, and insurance products and services. Reply 'STOP' to unsubscribe from SMS service. Reply 'Help' for help. Standard Message & data rates may apply. I understand these calls may be generated using an autodialer and may contain pre-recorded messages and that consenting is not required to participate in the offers promoted. I declare that I am a U.S. resident over the age of 18 and agree to this site's terms.

[Pl. SMF ¶ 21; Def. SMF ¶ 13 (emphasis added)]. The words "Marketing Partners" in this disclaimer contained a hyperlink to a separate page containing an alphabetized list of companies, including Citizens. [Pl. SMF ¶ 22; Def. SMF ¶ 14].

In April 2020, Citizens placed seven calls to Ms. Gaker's cell phone regarding its disability services. [Pl. SMF ¶ 8]. Ms. Gaker contends that these calls were placed in violation of the TCPA.

---

[1] Although Ms. Gaker denies any recollection of visiting the Super-Sweepstakes website, she does not contest the strong circumstantial evidence that she was the individual who entered her personal information on the website from the IP address located near her home in Florida.

### b. Procedural History

Ms. Gaker filed this matter as a putative class action in May 2020. [Dkt. 1]. Following discovery, Ms. Gaker moved to certify a class, [Dkt. 42], but she withdrew this motion before the Court could take action, [Dkt. 47]. Ms. Gaker then filed an amended complaint in April 2022 asserting only individual claims against Citizens. [Dkt. 58]. The parties filed the instant cross-motions for summary judgment, and the Court heard oral argument on January 23, 2023.

## II. STANDARDS OF LAW

### a. Summary Judgment

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (citing Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment may be granted when the record, viewed in the light most favorable to the non-moving party, presents no "genuine issue of material fact," and the moving party is entitled to judgment as a matter of law. Paul v. Murphy, 948 F.3d 42, 49 (1st Cir. 2020). The Court must determine (1) whether a factual dispute exists; (2) whether the factual dispute is "genuine," such that a "reasonable fact-finder could return a verdict for the nonmoving party on the basis of the evidence"; and (3) whether a fact that is genuinely in dispute is material, such that it "might affect the outcome of the suit under the applicable substantive law." Scott v. Sulzer Carbomedics, Inc., 141 F. Supp. 2d 154, 170 (D. Mass. 2001). Courts must draw all reasonable inferences in the non-moving party's favor, and "[t]he non-moving party may 'defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists.'" Paul, 948 F.3d at 49 (citation omitted). On issues where the non-

moving party bears the ultimate burden of proof, the non-moving party "must present definite, competent evidence to rebut the motion."  Mesnick, 950 F.2d at 822.

### b.  TCPA Claims

The TCPA empowers the Federal Communications Commission (FCC) to establish regulations "concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object."  47 U.S.C. § 227(c)(1).  Among the tools the statute creates to protect telephone consumers is the Do Not Call Registry, "a single national database … of telephone numbers of residential subscribers who object to receiving telephone solicitations."  Id. § 227(c)(3).  Further, the statute creates a private right of action available to any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations" established by the FCC.  Id. § 227(c)(5).  A prevailing party under this right of action is entitled to statutory damages of up to $500 per violation (which may be trebled upon a finding that a violation was willful or knowing), actual monetary losses, and injunctive relief.  See id.

The FCC regulations implementing the TCPA prohibit any telephone solicitation to any residential telephone subscriber who has registered her number on the Do Not Call Registry unless the solicitor "has obtained the subscriber's prior express invitation or permission."  47 C.F.R. § 64.1200(c)(2)(ii) (2022).  This permission "must be evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed."  Id.  The regulations further define the closely related concept of "prior express written consent" as "an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing

messages" that must include "a clear and conspicuous disclosure" that the consumer is authorizing the calls and that the person is not entering the agreement as a condition of purchasing any property, goods, or services.  Id. § 64.1200(f)(9).  The FCC's guidance directs that, where there is a question about whether a consumer has given consent, the telemarketer bears the burden to demonstrate that "a clear and conspicuous disclosure was provided and unambiguous consent was obtained."  In the Matter of Rules & Regs. Implementing the TCPA of 1991, 27 FCC Rcd. 1830 ¶¶ 26, 32, 33 (2012).

The protections of the TCPA and its implementing regulations apply only to "residential" telephone numbers.  See 47 U.S.C. § 227(c)(1).  The FCC interprets the term "residential" to relate to the statutory goal "to curb the 'pervasive' use of telemarking 'to market goods and services to the home.'"  In re Rules & Regs. Implementing the TCPA of 1991, 18 FCC Rcd. 14014, 14038–39 (2003).  The FCC thus applies a presumption that any cell phone subscriber who asks to be put on the Do Not Call Registry is a residential subscriber, but in enforcement actions, may require a subscriber to "provide further proof of the validity" of the presumption that they use the cell phone in question as a residential, rather than business, line.  Id. at 14039.

### III. DISCUSSION

It is beyond dispute that Ms. Gaker has satisfied most of the elements of a TCPA claim: she placed her cell phone number, which she uses as her primary residential line, on the Do Not Call Registry, and subsequently received seven telemarking calls from Citizens.  Her claim thus hinges on Citizens' affirmative defense that it obtained Ms. Gaker's express consent to be contacted through her submission of her personal information on the Super-Sweepstakes.com website.  A defendant who establishes that a consumer consented to receive telemarking calls is

Case 1:20-cv-11031-AK   Document 83   Filed 02/06/23   Page 7 of 18

not liable for a violation of the TCPA.  Rosenberg v. LoanDepot.com LLC, 435 F. Supp. 3d 308, 314–15 (D. Mass. 2020).  The defendant bears the burden of proof to establish that the consumer consented; lack of consent is not an element that the consumer must prove to establish her cause of action.  Breda v. Cellco P'ship, 934 F.3d 1, 4 n.4 (1st Cir. 2019).

Citizens obtained Ms. Gaker's personal information through the Super-Sweepstakes.com website.  The bottom of this website contains a disclaimer indicating that, by confirming one's entry, a participant "consent[s] to be contacted by any of our Marketing Partners," and a hyperlink embedded in the words "Marketing Partners" connects to a page listing Citizens, among many other companies.  Citizens rests on this as evincing clear and conspicuous disclosure, and unambiguous consent.  Ms. Gaker challenges the sufficiency of this disclosure on a number of grounds.

      a.  **Clear and Conspicuous Disclosure**

This jurisdiction has not directly interpreted the "clear and conspicuous disclosure" and "unambiguous consent" standard as implemented by the FCC's TCPA regulations.  See 27 FCC Rcd. 1830 ¶¶ 26, 32, 33.  However, the broader concepts of disclosure and consent in the context of online agreements have been thoroughly litigated.  Although the TCPA is the specific provision creating this cause of action, the essential question is whether the Super-Sweepstakes website adequately disclosed its language regarding marketing partners, such that it can be said that Ms. Gaker gave "unambiguous consent" to be bound by those terms—and thus, to be contacted by Citizens despite her registration on the Do Not Call Registry.  The Court thus begins by reviewing relevant precedent on disclosure of, and consent to, online terms and conditions.

7

i. **Assent to Online Agreements**

In <u>Emmanuel v. Handy Technologies</u>, 992 F.3d 1 (1st Cir 2021), the First Circuit reviewed the Massachusetts law "framework for analyzing issues of online contract formation." <u>Id.</u> at 7 (quoting <u>Kauders v. Uber Techs.</u>, 159 N.E.3d 1033, 1049 (Mass. 2021)).  <u>Kauders</u> established that, in order to form a contract online, "the user of the online interface must have been given 'reasonable notice of the terms' of the agreement and must have made a 'reasonable manifestation of assent to those terms.'" <u>Id.</u> (quoting <u>Kauders</u>, 159 N.E.3d at 1049).  This "reasonable notice requirement" is satisfied where "a party to the online contract has 'actual notice' of its terms, such as would be the case if that party had 'reviewed' those terms or 'must somehow interact with the terms before agreeing to them.'" <u>Id.</u>  However, even absent actual notice, the party seeking to enforce the online contract may satisfy the reasonable notice requirement if "'the totality of the circumstances' indicates that the user of the online interface was provided with such notice of the terms." <u>Id.</u> at 7–8.  The question at the heart of this "totality of the circumstances" inquiry is "whether the offeror has reasonably notified the user that there are terms to which the user will be bound and has given the user the opportunity to review those terms." <u>Id.</u> at 8 (citation and alterations omitted).  Courts will more likely find that reasonable notice was provided "where the notice conveys the full scope of the terms and conditions,'" and "the interface adequately communicates the terms of the agreement." <u>Id.</u> (citation and alterations omitted).

<u>Emmanuel</u> and <u>Kauders</u> further recognized a distinction between the forms in which website may present terms to users.  The most robust form through which a website may establish assent to terms is a "clickwrap agreement," by which "a user is 'required to expressly and affirmatively manifest assent to an online agreement by clicking or checking a box that

8

states that the user agrees to the terms and conditions.'" Emmanuel, 992 F.3d at 8 (quoting Kauders, 159 N.E.3d at 1050). In other words, a clickwrap agreement requires that a user take an affirmative step to agree to the proposed terms (most commonly, checking a box indicating he or she has read and agreed to the terms) *separately* from merely clicking a "continue" or "submit" button. Because clickwrap agreements require this express showing of intent, they are "are 'regularly enforced' and are the 'clearest manifestations of assent.'" Id. (quoting Kauders, 159 N.E.3d at 1050); see also Anand v. Heath, No. 19-CV-00016, 2019 WL 2716213, at *3 (N.D. Ill. June 28, 2019) (citation omitted) (defining clickwrap agreements as those in which "users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use").

At the other end of the spectrum, "browsewrap agreements" do not require a user to check a box indicating assent, but merely post terms and conditions of use on the website, "typically as a hyperlink at the bottom of the screen." Kauders, 159 N.E.3d at 1054 n.26 (quoting Hines v. Overstock.com, Inc., 668 F. Supp. 2d 362, 366 (E.D.N.Y. 2009)); see Nguyen v. Barnes & Noble, Inc., 763 F.3d. 1171, 1175–76 (9th Cir. 2014) (defining browsewrap agreements as those where "where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen"). In other words, a browsewrap agreement attempts to bind a user to terms simply because they appear on a page the user visited, with no further showing that the user read or agreed to the terms. Browsewrap agreements "are often unenforceable because there is no assurance that the user was ever put on notice of the existence of the terms or the link to those terms." Kauders, 159 N.E.3d at 1054 n.26.

Although the term is not in use in this circuit, several federal courts have defined a third category of online agreements between clickwrap and browsewrap, appropriately called a

"hybridwrap." A hybridwrap agreement incorporates elements of clickwrap and browsewrap agreements; generally, these types of agreements provide greater notice of the terms and conditions—and of the website's intent to bind the user to them—than a browsewrap agreement, but do not require the affirmative manifestation of intent that a clickwrap agreement does. One court defined a hybridwrap agreement as one that "merely present[s] the user with a hyperlink to the terms and conditions, rather than displaying the terms themselves." Nicosia v. Amazon.com, Inc., No. 14-cv-4513, 2019 WL 2482674, at *8 (E.D.N.Y. June 14, 2019). Another court found a hybridwrap agreement where the terms and conditions were presented by hyperlink, and "the user's ability to continue through the site was not conditioned on her express assent to the terms and conditions." Anand, 2019 WL 2716213 at *4. Generally, courts "will give effect to hybridwrap terms where the button required to perform the action manifesting assent … is located directly next to a hyperlink to the terms and a notice informing the user that, by clicking the button, the user is agreeing to those terms." Id. (quoting Nicosia, 2019 WL 2482674 at *8). Conversely, a court generally will not enforce a hybridwrap agreement where the website did not explicit condition the user's "continued navigation on the site to acceptance of the terms and conditions available through the hyperlink." Id.

      ii.  **Out-of-Circuit TCPA Precedent**

Courts in this circuit have not yet established a framework for determining whether online terms were sufficiently disclosed to provide a consent defense to a TCPA claim. However, the Ninth Circuit recently created such a rule in Berman v. Freedom Financial Network, 30 F.4th 849 (9th Cir. 2022). The plaintiffs in Berman had filed a TCPA class action against a telemarketer, which sought to enforce a mandatory arbitration clause, of which the plaintiffs argued they had not been given proper notice. The court synthesized earlier precedent

on the clickwrap-browsewrap distinction into a two-part test for determining whether terms and conditions presented on websites constitute "reasonably conspicuous notice." Id. at 856. To be binding on a plaintiff, a notice first "must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." Id. On this element, the Berman court announced it would consider the size of the notice's font, the comparative size and visibility of the notice's font to that of the surrounding text, and whether the surrounding website design draws the user's attention away from the text. See id. at 857. Secondly, if the website provided the challenged terms via hyperlink rather than on the webpage itself, "the fact that a hyperlink is present must be readily apparent." Id. The court emphasized here that "[s]imply underscoring words or phrases … will often be insufficient to alert a reasonably prudent user that a clickable link exists." Id. Rather, a website may satisfy this requirement by using a contrasting font color or all capital letters to draw attention to the link. Id.

  Further, the Berman court held that in order to demonstrate that a user had unambiguously manifested assent to terms and conditions, the website "must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement." Id. at 858. The opinion advises courts to look to whether the text of the website indicated "what action would constitute assent to those terms and conditions." Id.

  Berman's application of its two-part standard to its at-bar facts is instructive. The court described the website's text disclosing the challenged terms as "the antithesis of conspicuous," id. at 856, finding that it appeared only in "tiny gray font considerably smaller than the font used in the surrounding website elements … barely visible to the naked eye." Id. at 856–57. Further, the text of the notice was "deemphasized by the overall design of the webpage, in which other

visual elements draw the user's attention away from the barely readable critical text," and the website made no attempt to distinguish the hyperlink to the terms and conditions from the surrounding text. Id. at 857.

The Northern District of Illinois' decision in Sullivan v. All Web Leads, Inc., No. 17-C-1307, 2017 WL 2378079 (N.D. Ill. June 1, 2017), is similarly instructive, as it directly considered the merits of a TCPA claim similar to Ms. Gaker's. In that case, a telemarketer placed consent language in small print at the bottom of a page collecting personal information. Id. at *1. The plaintiff alleged that he had not seen the consent language before submitting his information, and had not realized that in submitting his information, he was consenting to telemarketing calls. Id. The telemarketer moved to dismiss, arguing, in part, that it had adequately procured the plaintiff's express consent. Id. at *6

On the more deferential posture of a motion to dismiss, the court concluded that the plaintiff had plausibly stated a claim that he had not expressly given consent. Id. at *8. It declined to hold that, as a matter of law, the notice the telemarketer had given on the website was "clear and conspicuous." Id. at *7. In doing so, the court evaluated seven cases—all outside of the TCPA context—which had considered various terms and conditions presented to consumers who had purportedly given some sort of consent via an internet form. Id. (collecting cases). From these cases, the court divined a general synthesis that a consumer is less likely to be bound to terms agreed to on the internet where the terms were located below the "accept" or "submit" button or were otherwise hidden or difficult to access, and were more likely to be bound where the website gave the consumer clear notice of the terms. See id. The court relied significantly upon the defendant's website's general silence on phone solicitations and placement of its purportedly binding consent disclosures below the "submit" button in holding that the plaintiff

had stated a plausible claim that he had not given express consent to phone solicitations. Id. at *8.

  **b. Application**

  In full consideration of all of the above precedent, the Court interprets the TCPA's "clear and conspicuous disclosure" and "unambiguous consent" standard, see 27 FCC Rcd. 1830 ¶¶ 26, 32, 33, similarly to the general Massachusetts and First Circuit standard for assent to online terms. The Court will apply a "totality of the circumstances" inquiry to determine whether the Super-Sweepstakes website "reasonably notified the user that there are terms to which the user will be bound," to wit, terms assenting to telephone solicitations; and further, "has given the user the opportunity to review those terms." Emmanuel, 992 F.3d at 8 (quoting Kauders, 159 N.E.3d at 1050).

  The distinction between "clickwrap," "browsewrap," and "hybridwrap" agreements that many courts have drawn is a useful tool for framing this analysis, but is not dispositive: as far as the Court is aware, no court has deemed an online agreement valid or invalid merely because it fits into one of these categories. Rather, this method of classification assists in the ultimate totality-of-the-circumstances inquiry by allowing courts to draw parallels between similarly categorized online agreements.

  Here, the Court concludes that Citizens has not met its burden to establish that "a clear and conspicuous disclosure was provided and unambiguous consent was obtained." 27 FCC Rcd. 1830 ¶¶ 26, 32, 33. The terms indicating that users who submitted their information on the Super-Sweepstakes website consented to be contacted by the site's marketing partners were printed in small font at the very bottom of the page. The Court accorded significant weight to the fact that the terms appeared below the "CONFIRM YOUR ENTRY" button, [Pl. SMF ¶¶ 19–

21], such that a user could—and in all likelihood, would—click on the button without ever reaching the portion of the page disclosing the terms. Further, the terms were printed in smaller font than other language on the page, and appeared in blue font against a blue background, with only slight variation in color between the language and the background. Although the terms were legible to an ordinary reader, no other language on the Super-Sweepstakes site was presented so inconspicuously, and all promotional language appeared in colors that distinctly contrasted from the background. Further, the website plainly does all that it can to divert the user's attention away from the terms: the page is replete with images of gold coins and dollar signs and is headlined with large text reading "Where should we send YOUR $50,000 if you win?" [Pl. SMF ¶¶16–17]. Beneath the fields where users can enter their personal information, but above the "CONFIRM YOUR ENTRY" button and the small font disclosing the terms, the page presents advertisements for additional services in larger and more legibly colored font. As Citizens' corporate designee suggested in his deposition, the website seems designed to appeal to people "looking for free money online," [see id. ¶ 24], with text and graphics promoting the supposed opportunity to win free money dominating the page.

      Citizens argues that the mere appearance of the challenged term—"By clicking confirm your entry I consent to be contacted by any of our Marketing Partners"—in full on the website, without requiring the user to click a hyperlink, constitutes clear and conspicuous disclosure. This statement of the legal significance of the user's submission of her entry, in plain language, favors Citizens. However, the mere presence of this disclosure on the webpage is insufficient to establish that the website "reasonably notified the user" of the terms. The totality of the page, including the size and color of the font and particularly the placement of the disclaimer at the bottom of the page, where a user who simply scrolled to the "CONFIRM YOUR ENTRY"

button and clicked on it would never have seen it, strongly indicates an intent to distract a reasonable user from the language.  See Sullivan, 2017 WL 2378079 at *8 (finding plaintiff stated an actionable TCPA claim where webpage had placed the disclosure at issue below the "submit" button).  Accordingly, Citizens has not established that it "reasonably notified the user" of the terms, nor that it gave "the user the opportunity to review those terms" prior to clicking "CONFIRM YOUR ENTRY."  Emmanuel, 992 F.3d at 8 (quoting Kauders, 159 N.E.3d at 1050).

Analysis of the Super-Sweepstakes website under the various frameworks the parties have cited reinforces the court's conclusion.  The terms do not meet any court's definition of a "clickwrap" agreement, which would carry a degree of presumption of validity.  Ms. Gaker was not required to check a box or otherwise indicate that she had read the terms and conditions before submitting her information.[2]  See id. (stating Massachusetts-law definition of a clickwrap agreement).  The Court could reasonably characterize these terms as either a "browsewrap" or "hybridwrap"; the latter term is not in use in all jurisdictions, and because neither classification carries a presumption of validity, it is not necessary to draw this distinction in order to conclude that Citizens has not met its burden to prove that the disclosure was clear and conspicuous.

Further, the disclosure would fail the two-part test that the Ninth Circuit articulated in Berman.  The first prong of that test requires the defendant to establish that the "notice [was] displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it."  Berman, 30 F.4th at 856.  The court there described

---

[2] Citizens' statement of material facts alleges that the Super-Sweepstakes website contained the language "By checking this box I agree that I am a US Resident over the age of 18, to the Privacy Policy, Terms and Conditions and to receive emails from Super-Sweepstakes & LivingLargeSweeps."  [Def. SMF ¶ 11].  Ms. Gaker denies this allegation.  Citizens cites a screenshot of the website and deposition testimony in support of this assertion.  However, the screenshot contains no such language, [Dkt. 66-1], and the deposition testimony is inconsistent with this assertion, [Dkt. 66-4].  Thus, the Court accorded no weight to this allegation.

the text disclosing the terms at issue as "the antithesis of conspicuous," relying on the text's small size (noting that it was both generally small, and small in comparison to other text on the page), its appearance in an inconspicuous color, and the overall design of the page deemphasizing the text by diverting the user's attention elsewhere through more striking visual elements. Each of these factors the Berman court relied on is present here, and the Court reaches the same conclusion: the Super-Sweepstakes website from which Citizens obtained Ms. Gaker's information is a textbook example of a webpage that attempts to hide its consent language from its users.

### c. Objective Standard

Citizens also argues that Ms. Gaker's deposition testimony renders her unable to rebut its affirmative defense of consent. At her deposition, Ms. Gaker repeatedly testified that she did not recall ever visiting the Super-Sweepstakes website or entering her personal information there, a point both parties restate in their statements of material facts. Ms. Gaker does not seriously contest the fact that she did enter the information, but Citizens argues that her lack of recollection of the event would prevent her from offering testimony as to whether the disclosure was "clear and conspicuous." See Fed. R. Evid. 602 (permitting a witness to testify to a matter "only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter"). Accordingly, because Ms. Gaker's testimony on the disclosure would be inadmissible, Citizens argues that she may not object to its assertion that she knowingly consented to phone solicitations, as Rule 56 requires that "the material cited to support or dispute a fact … be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

This argument is inapposite, as it improperly places a burden on Ms. Gaker to affirmatively disprove consent *subjectively*. There is no obligation upon Ms. Gaker to prove that the disclosure was not clear and conspicuous *to her, personally*. Rather, the regulations enforcing the TCPA characterize the term "clear and conspicuous" as an *objective* standard, applying the standard of whether the disclosure would be "apparent to the reasonable consumer." 47 C.F.R. § 64.1200(f)(3); see also Berman, 30 F.4th at 856 (adopting the objective standard of "a reasonably prudent Internet user"). The question for the finder of fact in this case would be how a reasonable person in Ms. Gaker's position would have interpreted the disclosure, and not how Ms. Gaker did herself. Ms. Gaker's inability to testify to how she perceived the disclosure is thus irrelevant to the strength of her claim or of Citizens' defense.

**IV.   DAMAGES**

Having held as a matter of law that Citizens cannot prove that it obtained Ms. Gaker's consent to telephone solicitations, the Court finds that each of the seven calls Citizens placed to Ms. Gaker in April 2020 constitutes a violation of the TCPA. The Court will award Ms. Gaker the maximum $500 in statutory damages available for each violation, 47 U.S.C. § 227(c)(5)(B), for a total of $3,500.

Statutory damages under the TCPA may be trebled where the defendant "willfully or knowingly violated the regulations" implementing the statute. Id. § 227(c)(5). Here, the parties agreed in their summary judgment briefing that Citizens "believed it had [Ms. Gaker's] express written consent" when it placed the offending calls. [Pl. SMF ¶ 28]. Accordingly, Ms. Gaker has conceded that treble damages are not appropriate in this case.

V.  **CONCLUSION**

Citizens' Motion for Summary Judgment [Dkt. 64] is **DENIED**.  Ms. Gaker's Motion for Summary Judgment [Dkt. 68] is **GRANTED**.  Judgment will enter for Ms. Gaker in the amount of $3,500.

**SO ORDERED.**

February 6, 2023                                         /s/ Angel Kelley
                                                                ANGEL KELLEY
                                                                U.S. DISTRICT JUDGE